FILED

03/23/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2021 Session

**STATE OF TENNESSEE v. ROBERT E. HUSE**

**Appeal from the Circuit Court for Dickson County**
**No. 2013-CR-229   Larry J. Wallace, Judge**

———————————————

**No. M2019-02087-CCA-R3-CD**

———————————————

The Dickson County Grand Jury charged Defendant, Robert E. Huse, with aggravated child abuse and first degree felony murder in connection with the death of his infant son, G.S.[1] Prior to trial, the State filed a notice of intent to introduce prior bad act evidence that Defendant abused another child four years before the victim's death.  Against Defendant's repeated objections, the trial court allowed the admission of the prior bad act evidence for the purposes of establishing intent, identity, and common scheme or plan.  Following trial, the jury convicted Defendant as charged, and the trial court sentenced Defendant to life for first degree felony murder and to a concurrent term of fifteen years for aggravated child abuse.  On appeal, Defendant argues that the evidence was insufficient to support his convictions and that the trial court erred in admitting the prior bad act evidence, which prejudiced him.  Following a thorough review of the record and applicable case law, we conclude that the trial court abused its discretion by admitting the prior bad act evidence and that this error prejudiced Defendant.  Therefore, we reverse the judgments of the trial court and remand for a new trial consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed**
**and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

M. Todd Ridley, Assistant Public Defender, Tennessee District Public Defenders Conference, Franklin, Tennessee, (on appeal), and William J. Lockert, III, District Public Defender, and Joshua T. Turnbow, Assistant District Public Defender, Ashland City, Tennessee, (at trial), for the appellant, Robert E. Huse.

---

[1] It is the custom of this court to refer to minors by their initials.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; W. Ray Crouch, District Attorney General; and Cody N. Brandon, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

*Motion in Limine to Introduce Prior Bad Acts Under Rule 404(b)*

Prior to trial, the State filed a Motion in Limine notifying Defendant of its intent to "introduce prior bad acts" at trial, pursuant to Tennessee Rule of Evidence 404(b). The State sought to introduce the details surrounding Defendant's 2009 conviction for accessory after the fact to child abuse related to injuries to Defendant's son, A.H.

At a pretrial 404(b) hearing, Erica Lee Demoss testified that she was Defendant's ex-wife and that she had two children with Defendant. Ms. Demoss said that, when she was pregnant with A.H.,[2] Defendant "blacked [her] eyes," "punched" her, "choked" her, and "kick[ed] [her] down some steps." Ms. Demoss testified that Defendant did not believe that A.H. was his child but that she later had a test establishing Defendant was the father.

Ms. Demoss said that, in November 2008 when A.H. was approximately five months old, Defendant was watching A.H. at home, and he called Ms. Demoss at her work because A.H. was "very fussy" and had vomiting and diarrhea. Defendant told Ms. Demoss that A.H. would throw up as soon as he fed him. Ms. Demoss stated that, due to A.H.'s premature birth, he often had vomiting and irritability but that, on the day of his injuries, he was "[i]nconsolable." Ms. Demoss left work, and she and Defendant took A.H. to the hospital. After running tests, the doctors found that A.H. had suffered a "subdural hematoma" on his forehead and the back of his head and that the occipital bone was injured. Ms. Demoss testified that the doctors also found an "old bleed" on A.H.'s brain. Ms. Demoss stated that Defendant was "nervous" and "scared" when he received A.H.'s diagnosis. Ms. Demoss stated that she pled guilty to "child neglect, failure to protect" related to A.H.'s November 2008 injuries.

Ms. Demoss testified that, after G.S.'s death in 2012, Defendant was shown on television at G.S.'s gravesite and that he called her to talk to her about the television appearance. Ms. Demoss stated that Defendant laughed and said, "Didn't my truck look good?"

---

[2] Ms. Demoss was not the mother of the victim in the present case, G.S.

Brittany Neville[3] testified that Defendant was the father of the victim, G.S., and that she was the victim's mother.  She stated that the victim was born healthy and was a "happy baby."  Ms. Neville testified that, on September 21, 2012, the victim was approximately two months old and that he began "projectile vomiting."  She explained that the victim would throw up as soon as she fed him.  Ms. Neville said that she took the victim to the hospital where he was admitted and an ultrasound was performed on his head.  The ultrasound revealed no abnormalities.  Ms. Neville recalled that the victim was diagnosed with colic and thrush and was discharged from the hospital on September 24, 2012, at 2:42 p.m. and that she and Defendant drove G.S. home after stopping at Walmart for supplies and to drop off the victim's prescriptions.  Ms. Neville testified that, when they arrived home, they left the victim in his car seat to let him sleep and that they brought the car seat into the house.  Ms. Neville left for work just before 5:00 p.m., and Defendant was alone with the victim.

While Ms. Neville was at work, Defendant contacted her to ask for the victim's social security number so that he could fill a prescription that the Walmart pharmacy had been unable to fill.  About three hours after Ms. Neville arrived at work, Defendant contacted her again to let her know that he and the victim were headed back to the hospital because the victim "wasn't breathing."

Ms. Neville testified that Defendant said that, while she was at work, he went to get the victim's medication and came back home.  Then he fed the victim and put the victim in his swing.  The victim was crying, so Defendant took him upstairs to put him in his crib and then went back downstairs to cook.  Ms. Neville stated that it was unusual to put the victim upstairs unless she or Defendant were also upstairs.  Defendant told Ms. Neville that he could no longer hear the victim crying, so Defendant went to check on the victim and found him "lifeless" and covered in vomit.  Ms. Neville recalled that there was vomit "all over [her] bed" and "on the sofa" and that "it was everywhere."

Ms. Neville explained that, during her relationship with Defendant, he "slapped" her in the face and pushed her down while she was pregnant and that he was "very controlling."  She said that, "a week or two" after the victim's death, Defendant got angry about something and "slammed" their chihuahua on the ground and injured it.  About a week before the victim's death, Defendant texted Ms. Neville a picture of the victim with a "black eye" and told her not to "freak out" because the dog had jumped on the victim.

---

[3] Ms. Neville's name at the pretrial hearing was Brittany Sanders.  However, by the time of trial, her name had changed to Brittany Neville.  For the sake of clarity and continuity, we will refer to her as Ms. Neville.

Ms. Neville said that, in January 2013, the medical examiner told her that the victim suffered blunt force trauma to his head with an injury to the occipital bone. She testified that she called Defendant to confront him about the autopsy report and that Defendant "cussed" at her and hung up the phone.

On cross-examination, Ms. Neville stated that her older children were around the victim on September 20, 2012, the day before the victim fell ill. Ms. Neville agreed that it was not unusual for a colicky baby to cry and that she did not have a lot of experience with colic.

Dickson Police Department Detective James Stanley Eubank testified that Defendant made a written statement on November 5, 2008, regarding A.H.'s injuries, which stated:

> [I]t first started about three days ago. [A.H.] started to get very fussy with everything we do, so he started crying more. And yesterday at 2:30 a.m., I fed him and he ate, I believe, four ounces and threw up all of it. Then went to sleep so I let him and now he will not eat or anything. He is very fussy and very sleepy, so we drove him to Vanderbilt to see what was wrong with him.

The prosecutor asked Detective Eubank to compare A.H.'s case to the present case. Detective Eubank testified that Defendant stated that he had been home alone with the victim and that he had fed the victim four ounces of formula, which was his same story in A.H.'s case. Detective Eubank agreed that Defendant said that the victim vomited and also stated that A.H. vomited. He agreed that Defendant said that he put A.H. in his swing and hit A.H.'s head on the swing and that Defendant also said he put the victim in his swing. He agreed that both A.H. and the victim had injuries to their occipital bones and contusions on their foreheads.

On cross-examination, Detective Eubank agreed that Defendant was not convicted of causing injuries to A.H. He agreed that Ms. Neville failed a polygraph examination regarding whether she caused the injuries to G.S. but said that she was eliminated as a suspect.

The prosecutor argued that the circumstances of the case involving A.H. were "virtually identical" to the circumstances in the present. The prosecutor noted that an injury to the occipital bone is a "very specific injury" and said that it "is more than coincidence that both children had the injury to the occipital bone and a contusion to the forehead in both cases." The prosecutor argued:

- 4 -

All of this evidence -- and without the first case, you know, we may be sitting here thinking, ["M]an, who committed this crime, who did this, who had -- who could have done this[?"] just looking at either case independently and without knowing about the other. But when you sit these two cases together and look at the evidence in both of them, what do they do? They all point directly to [D]efendant because the facts and the scenarios are almost identical. I mean, they lay -- they lay on top of each other. It's almost -- almost perfectly.

And I know that is the point of preventing the State from putting on prior bad acts is that you can't use somebody's first DUI to show that they committed a second. But the reason this is exceptional, Your Honor, is because the details and the facts are so exact and so close that that's when this type of evidence does fall into the 404(b) exception.

Defense counsel responded that there was no clear and convincing evidence that Defendant committed the prior act of child abuse against A.H. because "[n]o one has said that the [D]efendant intentionally or accidentally struck [A.H.] in the head or caused the injuries" to A.H. Defendant also argued that there was no material issue that satisfied the Rule 404(b) exceptions and that the prior bad act was more prejudicial than probative. Defense counsel stated:

[T]he State's own argument indicates how prejudicial this would be to jurors when the State says ["]if this case stood alone, we might be in a position of wondering who [did] it. But when you allow in the evidence of the first alleged prior bad act, then you can know basically who [did] it.["] That speaks to a juror hearing that evidence and believing it's in [D]efendant's character to commit that type [of] act. So that shows why it should not come in.

The prosecutor responded that the identity of the perpetrator was a material issue in the case, and thus, the prior bad act evidence was admissible. He said that the circumstances surrounding the two acts showed a *modus operandi* and that the State wanted to admit the evidence "to show the identity. That's all."

In a written order, the trial court stated:

Evidence of [D]efendant's involvement, conduct, and statements in the prior criminal case related to his son [A.H.], as well as testimony from Erica Demoss in regard to statements [D]efendant made to her, are admissible under T[ennessee] R[ule of] E[vidence] 404(b). In making this ruling, the

[c]ourt, in accordance with T[ennessee] R[ule of] E[vidence] 404(b)(1-4) finds; first, a material issue exists other than conduct conforming with a character trait and the 404(a) description against character evidence is not violated. More specifically, the [c]ourt finds that there are three (3) distinct material issues relevant to this case. They are intent, distinctive design/*modus operandi*, and identity. The [c]ourt finds all three applicable. Next, the [c]ourt finds that it is clear and convincing that [D]efendant was involved in causing some of [A.H.]'s injuries. . . . In addition, it's clear and convincing that the previous acts of [D]efendant involving [A.H.] closely resembled those alleged in the present case. More specifically, this [c]ourt heard testimony from Erica Demoss, Brittany [Neville] and Detective Eubank about the detailed similarities of both the case involving [A.H.], and the present case, and was able to assess the demeanor of said witnesses. The [c]ourt found them to be credible for this particular hearing and noted the following similarities:

a. Each child experienced projectile vomiting;

b. Each child was not eating;

c. Each child had severe nausea;

d. [D]efendant claimed to feed each of them prior to medical attention being needed (4 oz in both cases)[;]

e. Both children had injuries to the occipital bone;

f. Both children suffered from contusions; and

g. In both cases [D]efendant used and or mentioned using a swing and a crib.

Finally, the [c]ourt finds that the probative value of these acts is greater than the danger of unfair prejudice.

*Motion for Clarification*

Defendant filed a Motion for Clarification pursuant to Tennessee Rule of Evidence 404(b)(2), asking the trial court to clarify several points in its Order granting the State's Motion in Limine to introduce prior bad acts. Among those points of clarification, Defendant questioned what specific prior bad acts the trial court found to be proved by clear and convincing evidence. He stated, "In other words, the [c]ourt didn't find that

[D]efendant struck the baby [A.H.], dropped the baby [A.H.], shook the baby [A.H.], or was an accessory after the fact to any of the other adults having caused the injuries[.]" Defendant requested that the trial court explain "what prior bad act or acts caused which injuries and which injuries were caused by what prior bad act[.]" Defendant asked the trial court to clarify how the similarities between the circumstances in the two cases rose to the level of *modus operandi*.

During the hearing on the motion, defense counsel stated that it was undisputed that the victim died from intentional injuries, so the prior bad act evidence was irrelevant to establish intent or lack of accident. The prosecutor responded that the victim's death was a "signature killing" because it was "very rare to have a father with two biological children to have the exact same injury with no explainable cause for the injury." After taking the motion under advisement, the trial court issued a written Order denying the Motion for Clarification, stating that it previously complied with the requirements of Rule 404(b) when it ruled on the State's Motion in Limine and that no further clarification was necessary.

*Standing Objection*

The week before trial, defense counsel filed a written "standing objection" to the prior bad act evidence, stating in part:

> The [c]ourt made no finding as to how [A.H.] was injured, when injured and the method or instrumentality used to injure [A.H.] and made no finding as to how the baby in the current case [] was injured, when the child was injured and whether the injury was by blunt force trauma, the baby being shaken, by accident or any other means.

*Mid-Trial 404(b) Hearing*

The trial court held another jury-out 404(b) hearing regarding prior bad acts related to A.H.'s injuries. Dr. Kecia Nicole Carroll testified that she worked at Vanderbilt Medical Center Children's Hospital as a general pediatrician and that A.H. was her patient on November 5, 2008. Dr. Carroll stated that five-month-old A.H. presented as "fussy at times, sleepy at times, having some vomiting, [and] sort of not eating well." Dr. Carroll said that, following a CT scan, she noted that A.H. had a subdural hematoma and a fracture of the occipital bone. She determined that A.H.'s injuries "were not self-inflicted." Dr. Carroll's report concluded that A.H.'s "severe injuries with no explanation is very concerning for non-accidental trauma."

On cross-examination, Dr. Carroll testified that it was not her role to investigate or determine what caused A.H.'s injuries. Dr. Carroll said that she could not speculate as to

whether A.H. was shaken or dropped or struck but said that his injuries were "non-accidental." She said that she was not qualified to perform or interpret a CT scan, which was the job of the radiologist.

Defense counsel argued that Dr. Carroll's testimony regarding A.H.'s injuries was inadmissible because Dr. Carroll was not qualified to testify as to A.H.'s injuries because she was not a radiologist; therefore, whatever the radiologist told her would amount to hearsay. Defense counsel also argued that the video of Defendant's police interview should be heavily redacted to remove any mention of A.H.'s injuries or domestic violence, stating that those portions were "propensity evidence," irrelevant to the present case, and highly prejudicial.

The trial court ruled that Dr. Carroll was "sufficiently familiar enough to provide testimony in this area that she testified to," and it found that her testimony was relevant. Regarding the prior bad act evidence from the police interview, the trial court referenced its previous written order, stating that the evidence went to "intent, *modus operandi*, [] identity, . . . absence of mistake [or] accident[, and] guilty knowledge." The trial court quoted Rule 404(b) and stated, "The underlying theory is that repeated events of a similar nature make it unlikely that the event at issue was a product of chance or error." It found the probative value of the prior bad act evidence outweighed the prejudice to Defendant and said, "[T]he [c]ourt finds that it's clear and convincing about this evidence that [D]efendant [] committed bad acts or conduct to [A.H.] while in his care." The trial court cited *State v. Dubose*, 953 S.W.2d 649 (Tenn. 1997), and stated,

> Since the defendant [in *Dubose*] claimed the injury was accidental, apparently -- or apparently in the alternative if the injury was inflicted intentionally, it could have been done by others[,] [t]he proof that he was responsible for the prior injuries was highly probative on both his intent to harm the child and also that the fatal injury was not accidental.

The court stated, "Where you've got to prove this child has been abused by something other than accidental means, I think these prior incidents have relevance and the probative value outweighs the prejudicial effect."

Defense counsel responded, stating,

> Your Honor, we stipulate. We said all along we do not contend accident. We will stipulate that this was child abuse, was non-accidental. And based on the fact that we have previously offered to stipulate that and

offered to stipulate that now, I'll ask the [c]ourt for a finding as to why it would come in in regard to show lack of accident when we're stipulating?[4]

In response, the trial court referred defense counsel to *Dubose* and *State v. Lacy*, 983 S.W.2d 686 (Tenn. Crim. App. 1997) and its previous explanation regarding lack of accident or mistake.[5]

## *Second Mid-Trial 404(b) Hearing*

Detective James Lyle stated that, in 2008, he investigated Defendant related to injuries sustained by A.H. and that Defendant provided him with a written statement.[6] Detective Lyle said that Defendant told him that, after A.H. spit up and Defendant cleaned him, Defendant put A.H. in his swing to sleep. Defendant told Detective Lyle that he then took A.H. out of his swing and put him in his bed upstairs. Defendant told Detective Lyle that it was possible that Defendant injured A.H. when he hit his head on the car while placing him in his car seat. He told Detective Lyle that another possibility was that he hurt A.H. when he hit his head on his swing while placing him in his swing. Defense counsel stipulated to the admission of Defendant's written statement to Detective Lyle.[7]

## *Trial*

Dickson Fire Department Firefighter Robert Davenport testified that he was working as a medic for the fire department on September 24, 2012. Mr. Davenport and his partner responded to a call about an unresponsive child at a residence on Jones Creek Road. He stated that, when they arrived at the residence, Defendant directed them to the couch where the victim lay and handed the victim to Mr. Davenport. Mr. Davenport stated that

---

[4] During the jury-out hearing, defense counsel agreed to "do a written stipulation" that the victim suffered non-accidental injuries. The prosecutor agreed to "enter the order" regarding non-accidental trauma. However, no written stipulation appears in the record on appeal.

[5] The trial court ruled that the video recording of Defendant's police interview was admissible, stating that "evidence of convictions or being arrested or polygraph or DCS involvement" and domestic violence would be redacted. After much discussion during trial regarding redactions and the possible admission of a transcript rather than the video of the interview, this interview was never presented to the jury as an exhibit in any form.

[6] Detective Lyle read the statement into the record. It was the same statement Detective Eubank read into the record at the pretrial Motion in Limine hearing.

[7] Defense counsel objected to Detective Lyle's testimony, stating that he had not received anything regarding his testimony in discovery. Because there was a question as to whether defense counsel received discovery, the trial court permitted the State to introduce only Defendant's written statement to Detective Lyle regarding A.H. The parties agreed not to call Detective Lyle at trial, and Defendant's handwritten statement was admitted as an exhibit.

Defendant was the only person in the residence with the victim. He recalled that the victim was limp, had no pulse, and was a "grayish, ashy color." Mr. Davenport observed dried mucus around the victim's nose and mouth. EMS arrived shortly after Mr. Davenport, so Mr. Davenport took the victim to the ambulance and drove the ambulance to the hospital while the paramedics worked on the victim.

Matthew Daniel Tidwell testified that he was working as a Dickson EMS paramedic on September 24, 2012, and that he responded to a call of a "child not breathing" on Jones Creek Road. He recalled that, as soon as he and his partner arrived on the scene, Mr. Davenport handed him the victim. Mr. Tidwell stated that the victim was limp and had no pulse. Once he and his partner connected the victim to the monitor, he noted that the victim was in a "slow rhythm." With CPR and a bag valve mask delivering oxygen, Mr. Tidwell and his partner were able to increase the victim's pulse slightly, and the victim began to "pink up" in color.

Kara Godwin testified that she worked as an emergency department nurse at Horizon Medical Center ("Horizon") in 2012 and that she served as a trauma coordinator. Ms. Godwin testified that she was on duty when the victim was brought into the emergency room on September 24, 2012. She recalled that the victim was bluish in color and that the staff took turns performing CPR. Ms. Godwin stated that the victim "pinked up" a bit but never regained consciousness. She said that they "lost" the victim shortly thereafter.

Ms. Godwin recalled that the victim's mother arrived and that she was upset. The mother told Ms. Godwin that Centennial Medical Center ("Centennial"), where the victim had been treated earlier in the day, said that the victim was fine that morning. Ms. Godwin recalled that Defendant was present and was "crying" but that she "never saw tears come out of his eyes." She stated that, while everyone has a different response to stressful situations, in her opinion, Defendant's reaction was not a "normal response."

On cross-examination, Ms. Godwin stated that she did not evaluate Defendant to see if he was in shock.

Brittany Neville testified that she was the victim's mother and Defendant was the victim's father. She said that she was living with Defendant on Jones Creek Road at the time of the victim's birth and that her other two children and Defendant's two children also lived with them. Ms. Neville said that the victim loved to sleep in his swing downstairs in the living room. She recalled that, on September 21, 2012, the victim began projectile vomiting, so she took him to Horizon emergency room. After an hour or two, Horizon transferred the victim to Centennial. Ms. Neville stated that the victim remained at Centennial until September 24, 2012, and that he improved while he was at the hospital. Ms. Neville explained that the victim was discharged with diagnoses of colic and thrush

and that the victim had prescriptions that needed to be filled. Ms. Neville testified that, on their way home from the hospital, she and Defendant stopped at Walmart to fill the prescriptions. Walmart did not have one of the medications.

Ms. Neville recalled that, when they arrived home, she and Defendant did not remove the victim from his car seat because he was sleeping. Instead, they removed the seat from the car and brought it into the house. When Ms. Neville left for work at approximately 5:00 p.m., the victim was still asleep in his car seat.

Ms. Neville testified that Defendant texted her after she arrived at work and asked for the victim's social security number so he could try to fill the other prescription. Three hours after she arrived at work, Defendant called Ms. Neville and told her the victim was not breathing and that he was following an ambulance to Horizon. Ms. Neville stated that she left work and went to the hospital. She stated that she was with the victim when he died. She said that she and Defendant split up within a month after the victim's death. Ms. Neville said that, in January 2013, she received the autopsy report and that she took it to the police.

On cross-examination, Ms. Neville testified that Defendant left for work at approximately 5:00 p.m. on September 21, 2012. She said that her other two children were also at her house on the morning of September 21, 2012, after Defendant left for work.

Detective Eubank testified that he was on call on September 24, 2012, and that he received a call to go to Horizon for a "coded infant." Detective Eubank began a "sudden unexplained infant death" investigation. He said that he did not observe any external injuries on the victim that were concerning. Detective Eubank recalled that he pulled Defendant aside and asked him some questions. He testified that Defendant told him that the victim had been at Centennial earlier in the day. Defendant said that, after Ms. Neville left for work, the victim became fussy, so Defendant gave the victim four ounces of formula. Defendant told Detective Eubank that the chihuahua kept barking and upsetting the victim, so Defendant moved the victim upstairs to his crib. Defendant said that he went back downstairs to cook dinner. Defendant told Detective Eubank that, when the victim stopped crying, Defendant went back upstairs to check on him and found him unresponsive. Detective Eubank testified that Defendant never mentioned any sort of accident where the victim hurt his head.

Detective Eubank testified that, during his emergency room interview with Defendant, Defendant said that he fed the victim at 6:45 p.m., burped the victim, and then set him down for approximately ten to fifteen minutes in his swing, and then ten to fifteen minutes in his bed. Detective Eubank agreed that that would put the time Defendant discovered the victim unresponsive at about 7:10 p.m. Detective Eubank reviewed a CVS

pharmacy receipt procured by Defendant for nystatin, which was dated September 24, 2012, at 6:52 p.m. Detective Eubank said that the pharmacy receipt showed a discrepancy in Defendant's timeline. Detective Eubank agreed that the 9-1-1 call occurred at 8:12 p.m.

Dr. Carroll testified that, in November of 2008, she evaluated Defendant's five-month-old child, A.H., for possible child abuse. She said that A.H. was brought to the hospital for vomiting and fussiness. She read her report to the jury, which stated:

> [Defendant] reports early on day of admission, 11/4[/2008], patient drank a four-ounce bottle. [A.H.] ["]vomited a lot and was fussy.["] [Defendant] reports [that he] ["]cleaned [A.H.], gave him his paci and [A.H.] fell asleep . . . for about 45 minutes and then he was up about every 10 or 15 minutes because his paci was out. [Defendant] reports [that Ms. Demoss] woke up about 6:30 a.m. and tried to feed [A.H.,] but he ["]was real sleepy so figured he was not hungry.["] [Defendant] reports they tried to feed [A.H.] again, but he still would not eat. Only wanted to sleep. . . . [Defendant] reports ["]we brought him in because he was fussy, real sleepy, and not eating.["] [Defendant] reports [A.H.] did not have a history of a car accident, fall, any shaking, or other trauma. [Defendant] did report that the last time [A.H.] was hospitalized they ["]shaved the back of his head for an IV but they never put one in.["] [Defendant] reports he was beginning to wonder if whether they hit the soft spot in the back of his head.

Dr. Carroll stated that A.H. had a fracture to his left occipital bone and a subdural hematoma. Her report concluded, "[A.H.'s] severe injuries are not self-inflicted. . . . And per the history as reviewed and obtained from the parents, there is no explanation for the injuries. [A.H.]'s severe injuries with no explanation is very concerning for non-accidental trauma."

On cross-examination, Dr. Carroll read another portion of her report:

> [Ms. Demoss] reports [that A.H.] had been eating well, but before coming in for the past few days he was extremely cranky, but that it might be [] he did not sleep [well]. [Ms. Demoss] reports on the day of admission "in the morning he ate at 2:30 and projectile puked everywhere and from then on he did not eat. He'd cry, but from then on he would not eat and he would just be really whiny. [Ms. Demoss] figured it was his acid reflux." [Ms. Demoss] reports she called a phone nurse who advised that [A.H.] be brought in for evaluation.

Dr. Carroll agreed that Ms. Demoss said that A.H.'s symptoms began at 2:30 a.m. on the day he was brought into the hospital. She read a prior medical report from Vanderbilt Medical Center, dated August 12, 2008, which stated, "[Ms. Demoss] appeared overwhelmed at times with care for infant and voiced that she gets little support from [Defendant] or mother-in-law. She has [] a one-year-old infant at home currently as well. Encouraged to get rest and self-care." Dr. Carroll read another medical report from Vanderbilt Medical Center, dated June 2, 2008, which stated,

> [A.H.] is an almost four-month-old male who is a 24-week pre[e]mie. He was cared for in neonatal ICU at Centennial. . . . He presented today with three days of projectile vomiting, which is worse than his usual persistent vomiting secondary to his reflux. [Ms. Demoss] is very frustrated and very tired. She says he screams and hollers, throws his head back, wants to eat and then vomits almost immediately after he drinks. He drinks approximately four to five ounces every three hours; however, sometimes she does re-feed him after he vomits. She's quite stressed and does not want to go home with him.

Dr. Carroll read another medical note from Vanderbilt Medical Center,[8] which stated, "[Ms. Demoss] seems disconnected from baby. NICU says they have impaired for appropriate bonding."

Dr. David Zimmerman testified as an expert in forensic pathology and stated that he worked as a medical examiner in Davidson County. He stated that he performed an autopsy on the victim on September 25, 2012. Dr. Zimmerman said that he found a "faint contusion" on the victim's "right forehead" and a "bilateral subdural hemorrhage" on both sides of the victim's head. He explained that a "subdural hemorrhage" was "blood that's on the surface of the brain." Dr. Zimmerman testified that he also found an "epidural hemorrhage," which was "blood between the occipital bone [and] one of the membranes that surrounds the brain." He noted that there was a subdural hemorrhage around the spinal cord. Dr. Zimmerman concluded that the victim's injuries and subsequent death were a result of blunt force trauma to the head and that the manner of death was homicide. He explained, "The head would have to have been struck by something or struck a solid object in order to cause the dura to separate from the skull like that and to cause the subdural hemorrhage." Dr. Zimmerman also included "shaking" as blunt force trauma. He described "shaken baby syndrome" as

---

[8] The date of this third medical record is not mentioned in the transcript, and none of the three medical records presented on cross-examination were admitted as exhibits.

- 13 -

someone is holding onto the infant and is shaking them vigorously back and forth. The head is flopping back and forth or side to side. The brain moves inside the skull with -- because of the changing and momentum, the head comes forward, the skull stops moving but the brain may continue to move inside the skull a little bit, and then the sudden change of direction, the head flops back. The same thing happens repeatedly as long as the shaking continues to occur.

Dr. Zimmerman compared the force necessary to cause these injuries to the force involved in a motor vehicle collision. He said, "It's not just falling off a chair or something like that." Dr. Zimmerman concluded that symptoms from the victim's bleeding likely began anywhere from minutes to two hours after the application of force. He described the possible symptoms to include "loss of consciousness, difficulty breathing, irritability and crying, not eating, and even death." He said that blood clotting can begin anywhere from eight to seventy-two hours after the application of force and noted that the victim had "non-adherent hemorrhage with focal small areas of acute organization." Dr. Zimmerman stated that he reviewed the victim's prior medical records to rule out natural causes for the injuries.

On cross-examination, Dr. Zimmerman agreed that no one at Centennial performed a CT or MRI scan of the victim in the days preceding his death. He agreed that an ultrasound was not the proper diagnostic tool for a brain bleed and that the ultrasound performed on the victim at Centennial may not have detected a possible brain bleed. He agreed that the injuries to the victim occurred between eight and seventy-two hours prior to the time of death.

On redirect examination, Dr. Zimmerman stated that he could not give an exact time for the application of force but could only give a rough estimate. He explained that, from 5:00 p.m. when Ms. Neville left for work and 9:22 p.m. when the victim died, the length of time was not enough time for the blood to clot.

On recross-examination, Dr. Zimmerman stated that "[t]he autopsy microscopic findings are not consistent with the injury occurring" between 5:00 p.m. when Ms. Neville left for work and 9:22 p.m. when the victim died.

On further re-direct examination, Dr. Zimmerman stated that it was possible that the victim could have suffered the injuries while he was at Centennial earlier in the day but that he has never seen a blunt force trauma injury which occurred at a hospital.

Dr. Travis Wilson Crook testified as an expert in pediatrics and stated that he was a "pediatric hospitalist" with Vanderbilt Medical Center. He said that he had treated about

10,000 children during his career and that "hundreds" of those children had brain injuries. Dr. Crook stated that he was working at Centennial on September 21, 2012, and that he attended to the victim. He said that the victim was admitted with vomiting, diarrhea, dehydration, and "not tolerating his f[ood.]" Dr. Crook explained that an ultrasound scan is "useful for looking at gross structures of the brain" and that the ultrasound scan of the victim's brain was normal. He agreed that neither a CT scan nor an MRI scan were performed at Centennial. Dr. Crook recalled that, after four days of treatment, the victim had improved and was alert, playful, and feeding normally, so the victim was discharged on September 24, 2012.

Dr. Crook testified that he reviewed the victim's autopsy report. He explained that the victim had two different types of bleeding in his brain – epidural and subdural. He said it was impossible that these injuries occurred while the victim was a patient at Centennial because "[t]he degree of this amount of head bleed would have caused acute decompensation. . . . [a]nd then quickly proceed[ed] to death." He stated that the victim would not have improved the way he did if he had had this injury before or during his time at Centennial. Dr. Crook estimated that the victim died within minutes of receiving his injuries.

Dr. Crook said that epidural and subdural bleeds are caused by two different mechanisms. He explained that an epidural bleed is caused by "blunt force trauma, direct impact" and that a subdural bleed is caused by "a shearing force, usually caused by sudden acceleration/deceleration" like those found during a "car accident that comes to a sudden stop" or with "shaking" as in "shaken baby syndrome." He stated that falling off a chair or couch and hitting the head would not be enough force to cause the victim's subdural injuries. Dr. Crook said, "[W]e don't even check for [brain] bleeds unless it's a fall of four feet or higher. . . onto a hard surface."

Dr. Crook said that it was very difficult to tell the age of a bleed beyond "new" and "old," as in "very, very fresh, within hours" or if has been bleeding for a week. Dr. Crook did not think that Dr. Zimmerman's estimation of "eight to seventy-two hours" was an "unreasonable best guess" but stated that it was "very difficult to tell with any certainty that [] type of window." Dr. Crook said that it was just as likely that the injuries occurred one hour before death as it was that they occurred eight hours before death.

Dr. Crook stated that there were "fourteen different steps" involved in blood clotting and that disruption of any of the fourteen steps could "throw off" any degree of accuracy for a timeline of injury. Dr. Crook said that the victim's "massive head injury" likely caused a "neurochemical disruption," which disrupted his clotting process. Dr. Crook also noted that, when death occurred, the liver stopped receiving blood so the liver was "no

longer activating factors to cause that clotting to occur." Dr. Crook concluded that the victim's injuries occurred within "a couple hours" of his death.

On cross-examination, Dr. Crook testified that the victim presented with vomiting and diarrhea "two days prior to arrival" at Centennial. Dr. Crook stated that an undiagnosed brain bleed could cause projectile vomiting. He agreed that the victim's injuries could have occurred from a single incident. He denied that the victim could have suffered any shaking prior to September 24, 2012, that would result in these injuries.

Dr. Crook stated that he had never performed an autopsy. He said that he did not examine the actual tissue samples taken from the victim during the autopsy. Dr. Crook testified that, "without a shadow of a doubt[,] this child did not have these injuries while he was in the hospital [at Centennial]." He agreed that, if the victim was admitted to Centennial with a brain bleed, and Dr. Crook failed to diagnose the brain bleed, Dr. Crook would be subject to a malpractice lawsuit. Dr. Crook denied that the threat of a lawsuit was his motive for disagreeing with Dr. Zimmerman. He explained:

[T]he child continued to get better. If this child had the degree of bleeds that he had when he was [at Centennial], one, he would have perished within the first hour or so of arriving. Number two, he would not have gotten better without extreme intervention, like I mentioned, neurological or neurosurgery intervention where they drain the bleed. None of those occurred and this child returned to normal.

Dr. Crook agreed that a parent who was not a trained medical professional might not notice subtle symptoms in a child with a head injury. He said that the ultrasound scan performed at Centennial would have picked up the degree of brain bleed that was seen on the autopsy. Dr. Crook agreed that an ultrasound scan would not have picked up a small brain bleed. However, Dr. Crook explained that, if the victim had a small brain bleed that continued to grow over time, he "would have gotten extremely sick very quickly" instead of improving while at Centennial. He explained, "[T]his is not one of those things where you see no symptoms, no symptoms, and then all of a sudden there's a tipping over point. You would have seen a progression of symptoms with a child decompensating over a period of time."

During the State's closing arguments, the prosecutor referenced A.H.'s injuries, stating that in "2008, [A.H.] was five months old and had almost the exact same injuries. And [D]efendant gave almost the exact same story down to the amount of formula he gave his child." During the State's rebuttal closing, the prosecutor again referenced A.H.'s injuries, stating, "we've got two infants" with the "same injury." The prosecutor noted that Defendant's statements to police in both cases were that he was home alone with each baby

and that he fed each baby four ounces of formula.  He said, "That, ladies and gentlemen, is more than a coinciden[ce]."  Upon objection from defense counsel for submitting propensity evidence, an out-of-jury hearing was held, and the trial court agreed to allow defense counsel to prepare a curative instruction for its review.  Upon return of the jury, the prosecutor continued:

> [A.H.], age five months.  Residence, [] Jones Creek Road.  Injury, subdural bleed, occipital bone.  Mother, [Ms. Demoss].  Defendant's story, fed four ounces, put into a crib.  Later that day transported to Vanderbilt.
>
> [The victim], residence [] Jones Creek Road.  Injury, subdural bleed, occipital bone.  Mother, [Ms.] Neville.  Defendant's story, four ounces of milk, swing, crib, hospital.

Following closing arguments, the trial court reviewed defense counsel's proposed curative instruction and rejected it.[9]  Instead, when the trial court instructed the jury, it included a limiting instruction that it could only consider prior bad act evidence to establish identity, common scheme or plan, and/or intent:

> If from the proof you find [that D]efendant committed the crime other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial.
>
> This evidence may only be considered by you for the limited purpose of determining whether it provides:
>
> [D]efendant's identity.  That is, such evidence may be considered by you if it tends to establish [D]efendant's identity in the case on trial.
>
> A scheme or plan.  That is, such evidence may be considered by you if it tends to establish that [D]efendant engaged in a common scheme or plan for the commission of two or more crimes so related to each other that proof of one tends to establish the other.
>
> [D]efendant's intent.  That is, such evidence that may be considered by you if it tends to establish that [D]efendant actually intended to commit the crime with which he is presently charged.

---

[9] The trial court stated that defense counsel's proposed jury instruction would be included as Exhibit B for identification purposes only.  However, no Exhibit B appears in the record on appeal.

Such evidence of another crime, if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.

Following deliberations, the jury convicted Defendant of first degree felony murder in count one and aggravated child abuse in count two. The trial court sentenced Defendant to concurrent sentences of life for first degree felony murder and fifteen years for aggravated child abuse. Defendant filed a timely motion for new trial, which the trial court denied. Defendant now timely appeals.

## <u>Analysis</u>

On appeal, Defendant argues that the evidence was insufficient to sustain his convictions. He also argues that the trial court erred by admitting prior bad act evidence in contravention of Tennessee Rule of Evidence 404(b).

### *I. Sufficiency*

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged here, first degree felony murder is "[a] killing of another committed in the perpetration of . . . aggravated child abuse[.]" Tenn. Code Ann. 39-13-202(a)(2) (2012). "No culpable mental state is required for conviction under [Tennessee Code Annotated section 39-13-202(a)(2)], except the intent to commit the enumerated offenses[.]" Tenn. Code Ann. 39-13-202(b) (2012). "A person commits the offense of

aggravated child abuse . . . who commits child abuse, as defined in [Tennessee Code Annotated section] 39-15-401(a) . . . and[] [t]he act of abuse results in serious bodily injury to the child[.]" Tenn. Code Ann. § 39-15-402(a)(1) (2012). "Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits" child abuse. Tenn. Code Ann. § 39-15-401(a) (2012).

Here, the victim was admitted to Centennial for three days with gastrointestinal issues and dehydration. Dr. Crook tended the victim and testified that the victim had fully recovered prior to his discharge from Centennial on September 24, 2012. Defendant and Ms. Neville filled one of the victim's prescriptions after they left Centennial and then went home. Ms. Neville left for work shortly thereafter, at approximately 5:00 p.m. and left the victim alone with Defendant. Defendant called 9-1-1 at 8:12 p.m. Mr. Davenport testified that, when he arrived with EMS, only the Defendant and the victim were at the residence. Dr. Crook testified that it was impossible that the victim's injuries occurred while he was a patient at Centennial because "[t]he degree of this amount of head bleed would have caused acute decompensation. . . . [a]nd then quickly proceed[ed] to death." He stated that the victim would not have improved the way he did while at Centennial if he had had this injury before or during his time at Centennial. Dr. Crook estimated that the victim died within minutes to "a couple hours" of receiving his injuries. Both Dr. Zimmerman and Dr. Crook testified that the injuries were non-accidental. Taken in the light most favorable to the State, the evidence was sufficient for a rational trier of fact to find that Defendant was alone with the victim when the injuries occurred, that Defendant knowingly inflicted the injuries, and that the victim died as a result of those injuries. Defendant is not entitled to relief on this issue.

## II. Rule 404(b): Prior Bad Act Evidence

Defendant argues that the details regarding A.H.'s injuries and Defendant's subsequent conviction for "child abuse, accessory after the fact" related to A.H.'s injuries was improper "prior bad act" evidence that should have been excluded by Rule 404(b) and that the error prejudiced Defendant.

The State responds that the prior bad act evidence was admissible under the Rule 404(b) exceptions to show intent and "absence of mistake or accident." Alternatively, the State argues that any error did not prejudice Defendant.

### A. Standard of Review

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652; *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989)). We will reverse the trial court's decision for abuse of discretion "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

Here, Defendant concedes that the trial court followed the procedural requirements of Rule 404(b), and we agree. Thus, we will review the trial court's decision for an abuse of discretion.

## B. Rule 404(b) Exception: Identity

Defendant argues that the prior bad act and the offense in the present case are not so distinct as to constitute a "signature crime," which is required for admission under Rule 404(b) for the purpose of identity. The State concedes this point, and we agree.

It is undisputed on appeal that the identity of the perpetrator was a material issue in this case. To admit evidence under Rule 404(b) for the purpose of identity, the methods employed in the prior bad acts and the charged offense must show a "signature crime." *See State v. Jones*, 450 S.W.3d 866, 894-96 (Tenn. 2014); *State v. Donald Joseph Powell*, No. M2014-01132-CCA-R3-CD, 2015 WL 3563106, at *8 (Tenn. Crim. App. June 8, 2015). In *State v. Jones*, our supreme court explained:

> Where, as here, the material issue at trial is the identity of the [perpetrator],
>
>> [t]he probative value of evidence of other crimes . . . depends upon the extent to which it raises an inference that the perpetrator of the prior offenses was the perpetrator of the offense in issue. Both the existence and the strength of an inference proceeds through an evaluation of the similarities between the prior offense and the charged crime. Thus, *if the characteristics of both the prior offense and the charged offense are not in any way distinctive,* but are similar to numerous other crimes committed by persons other than the defendant, no *inference of identity can arise. An inference of identity from prior crimes can only arise when the elements of the prior offense and the charged offense, singly or together, are sufficiently distinctive to warrant an inference that the person who committed the prior offense[] also committed the offense on* trial. . . . The probative value of evidence of other crimes on the issue of identity always depends upon the strength of the inference; when the inference of identity is weak, evidence of prior crimes should be excluded because under such circumstances the prejudicial effect of the evidence inevitably outweighs the probative value of that evidence.

450 S.W.3d at 895 (quoting *Bunch v. State*, 605 S.W.2d 227, 230 (Tenn. 1980)) (emphasis in original). Our supreme court in *Jones* continued:

> Although the evidence of the other crime need not be identical to the evidence of the charged offense, for other crime evidence to have probative

value it must bear a sufficient connection to the issue of identity so as to establish the defendant's commission of "signature crimes." To meet this threshold, the similarities of the crimes must do more than simply outweigh their differences—there must be a "'highly distinctive common mark'" between the crimes. *Bunch,* 605 S.W.2d at 231 (quoting *People v. Cavanaugh,* 444 P.2d 110, 117 (Cal. 1968)); *see also State v. Moore,* 6 S.W.3d 235, 240 (Tenn. 1999) (quoting *State v. Carter,* 714 S.W.2d 241, 245 (Tenn.1986)) ("Before multiple offenses may be said to reveal a distinctive design, and therefore give rise to an inference of identity, the '*modus operandi* employed must be so unique and distinctive as to be like a signature.'"). The test, therefore, is not whether the evidence demonstrates that the defendant committed both crimes, but whether the defendant used a peculiar and distinctive method in committing the crimes. *See Young v. State,* 566 S.W.2d 895, 897 (Tenn. Crim. App. 1978). For example, in *Harris v. State* [227 S.W.2d 8, 11 (Tenn. 1950)]*,* this Court recognized that

> a particular strat[a]gem or method [may have] such unusual particularities that reasonable men can consider that it would not likely be employed by different persons. Many men commit murder, but Jack the Ripper used his knife in a manner so peculiar that when his crimes were viewed together there could be little doubt that they were committed by the same man. Merely the fact, however, that a series of such crimes may be committed with a knife will not render them unusual enough to identify the perpetrator of one as the perpetrator of the others.

*Id*. "[M]ere similarity in the manner in which two crimes are committed does not produce the relevance necessary for admission—*uniqueness does.*" *State v. Roberson,* 846 S.W.2d 278, 280 (Tenn. Crim. App. 1992) (emphasis added). "Although the offenses need not be identical in every respect, the *method* employed in committing the offenses must have 'such unusual particularities that reasonable men can conclude that it would not likely be employed by different persons.'" *Toliver*, 117 S.W.3d at 229 (quoting *Shirley,* 6 S.W.3d at 248) (emphasis in original). "[T]he less unique and distinctive the methods, the less appropriate the inference" that a defendant committed both crimes. *Roberson,* 846 S.W.2d at 280.

Here, the trial court noted several similarities between the prior bad act involving A.H. and the circumstances of the present case:

a. Each child experienced projectile vomiting;

- 22 -

b. Each child was not eating;

c. Each child had severe nausea;

d. [D]efendant claimed to feed each of them prior to medical attention being needed (4 oz in both cases)[;]

e. Both children had injuries to the occipital bone;

f. Both children suffered from contusions; and

g. In both cases [D]efendant used and or mentioned using a swing and a crib.

None of these circumstances, alone or taken together, constitute a "signature crime" of such uniqueness that an inference that Defendant was the perpetrator would arise. *See id*. Innumerable parents care for sick children every day, feed their infants four ounces of formula, and put them in swings and cribs. Moreover, the injuries sustained by the infants in both cases – contusions and injuries to their occipital bones – were not so unusually particular that reasonable individuals could conclude that the method involved in causing the injuries "would not likely be employed by different persons." *Toliver*, 117 S.W.3d at 229. Thus, the trial court abused its discretion in admitting the evidence for the purpose of showing the identity of the perpetrator.

## C. Rule 404(b) Exception: Intent

Defendant argues that the trial court erred by admitting the prior bad act evidence for the purpose of establishing intent because intent was not a material issue at trial. He contends that, because he stipulated that the victim's injuries were non-accidental, the trial court should not have admitted the prior bad act evidence to show intent.

The State responds that the trial court properly admitted the evidence to show intent and "absence of mistake or accident." It asserts that Defendant's offer to stipulate to the non-accidental nature of the victim's injuries does not preclude the State's ability to present evidence to establish the essential elements of the offense.

Initially we note that, while the trial court ruled that the prior bad act evidence was admissible to show absence of mistake or accident, it did not specifically instruct the jury to consider the evidence for that purpose. The jury instructions reveal that the trial court only instructed the jury that they could consider the evidence as proof of Defendant's intent, identity, or to show a common scheme or plan. Thus, we will not consider the admissibility of the evidence to show absence of mistake or accident, as the State argues

on appeal. *See State v. Christopher Bailey*, No. W2014-02434-CCA-R3-CD, 2016 WL 7742753, at *7 (Tenn. Crim. App. Apr. 8, 2016) (choosing not to consider whether prior bad act evidence would have been admissible to show context because the trial court instructed the jury only on intent).

Next, while Defendant agreed to stipulate prior to trial that the victim's injuries were non-accidental, this offer to stipulate did not automatically render immaterial the issue of intent. *See State v. James*, 81 S.W.3d 751, 761 (Tenn. 2002) (stating that, "[i]n lieu of accepting a stipulation to certain facts, the State may satisfy its burden of proving every element of the charged offense beyond a reasonable doubt . . . by introducing evidence of its own choice in support of those same facts.")[10] "[A] mere offer to stipulate evidence does not render that evidence irrelevant under Rule 404(b)(2)." *Id.*; *but see Bunch*, 605 S.W.2d at 230 ("[E]vidence that the defendant committed another crime is admissible only if the ground for relevance is actually being contested in the case on trial.").

Although the issue of intent was not immaterial, the admission of prior bad act evidence to show intent was improper in this case. *See e.g., State v. Benjamin Gunn*, No. W2013-02006-CCA-R3-CD, 2015 WL 847431, at *4 (Tenn. Crim. App. Jan. 30, 2015) (quoting W. MARK WARD, TENNESSEE CRIMINAL TRIAL PRACTICE § 22:24 (2014-2015 ed.)) ("[T]he 'intent' exception [to Rule 404(b)] should not allow the introduction of other crimes simply to allow the [S]tate to prove the applicable mens rea."). When prior bad act evidence is admitted to show intent,

> the [S]tate should be required to articulate a tenable, non-propensity, non-character theory of logical relevance. This means that the state should be able to demonstrate that the prior crime is "connected" to the present crime in some unique way such that it has probative value on the issue of intent apart from any inference that [the] defendant simply has the propensity to commit that type of offense.

WARD, TENNESSEE CRIMINAL TRIAL PRACTICE § 22:24 (2020-2021 ed.); *see also State v. Cortney R. Logan*, No. M2014-01687-CCA-R3-CD, 2015 WL 5883187, at *9 (Tenn. Crim. App. Oct. 8, 2015), *perm. app. denied* (Tenn. Feb. 18, 2016). "Among possible considerations in assessing whether the crimes are [']connected['] is whether the offenses involved the same victim, the same location, the time lapse between the offenses, and whether they involved any unique *modus operandi*." WARD, TENNESSEE CRIMINAL TRIAL PRACTICE § 22:24 n. 46 (2020-2021 ed.); *see also State v. Keith A. Otey*, No. M2000-

---

[10] Here, the prosecutor finally agreed to the stipulation during a mid-trial Rule 404(b) hearing, stating, "Judge, we'll be happy to enter the order that it was non-accidental trauma." However, at this point during trial, the prior bad act evidence had already been introduced to the jury through Dr. Carroll's testimony. No order of stipulation was entered, and nothing was said to the jury regarding the stipulation.

01809-CCA-R3-CD 2002 WL 560960 (Tenn. Crim. App. Apr. 16, 2002) (reversing where trial court allowed proof of a drug sale committed six years prior to the offense on trial because "there was *no logical connection or relationship* between the [d]efendant's prior drug sale and the [d]efendant's possession of drugs in the present case"); *State v. Leslie Brian Willis*, No. 01C01-9802-CC-00068, 1999 WL 510602, at *5 (Tenn. Crim. App. July 15, 1999) (finding error where the trial court admitted prior bad act evidence for the purpose of intent when there was "no logical progression nor any cause-and-effect relationship" between the two crimes, "only the extrapolation that, if the defendant intended rape of a female in 1985, he must be the sort of person who intended to rape" another woman"), *perm. app. denied* (Tenn. Oct. 23, 2000). However, "when the material issue is intent, the facts and circumstances connecting the two crimes need not be so unique and distinctive as to constitute signature crime or distinct *modus operandi.*" *Donald Joseph Powell*, 2015 WL 3563106, at *8.

Here, the State failed to show a sufficient logical connection between the prior bad act evidence and the charged offense, and thus, the trial court should not have admitted the prior bad act for the purpose of intent. The events involved two different children, occurred four years apart, and showed no cause-and-effect relationship. That Defendant fed both children, that he placed both children in swings and cribs, and that both children suffered head trauma are inadequate to create a logical connection between the two events, other than Defendant's propensity to commit the charged offense. "The conclusion that the defendant had the specific intent to commit the crime charged on a specific day and time because he . . . committed a similar crime on another day and time requires an inference that the defendant has the propensity to commit the crime on trial[,] which is precisely what is condemned by [] Rule [404(b)]." *Benjamin Gunn*, 2015 WL 847431, at *4. While the trial court relied on *Dubose* for its ruling that the prior bad act evidence was admissible to show intent, we distinguish the present case because the incidents in *Dubose* involved the same victim and occurred close in time, four months apart, thus showing a settled purpose to harm the victim. *DuBose*, 953 S.W.2d at 654; *see State v. Jarman*, 604 S.W.3d 24, 49 (Tenn. 2020).

Finally, the admission of the prior bad act to show intent was unnecessary and unfairly prejudicial. Defendant repeatedly offered to stipulate that the victim's injuries were non-accidental trauma, and defense counsel told the trial court, "We will stipulate that this was child abuse." While the State was free to reject the stipulation, the prosecutor stated during a mid-trial Rule 404(b) hearing, "Judge, we'll be happy to enter the order that it was non-accidental trauma." Regardless of the stipulation, the State introduced ample medical evidence from both expert witnesses that the victim's injuries were non-accidental, and no witness testified that the victim's injuries could have been accidental or unintentional. Even the prosecutor stated in her closing argument that the issues of intent and absence of mistake were "really not in dispute." In light of the evidence available to

the State at trial, the admission of the prior bad act evidence was unnecessary to prove intent, and the danger of unfair prejudice outweighed its probative value. *See Jones*, 450 S.W.3d at 894 (stating that the trial court must "weigh the[] concerns of unfair prejudice against any probative value of the proffered evidence, which will depend upon the actual need for the evidence in light of the issues at trial and the other evidence available to the State"); *State v. Donnell Tunstall*, No. W2014-00257-CCA-R3-CD, 2015 WL 1089742, at *8 (Tenn. Crim. App. Mar. 10, 2015) (concluding that identity was not a material issue for the purpose of Rule 404(b) because the defendant did not dispute that he was the victim's attacker); *State v. Wesley M. Gifford, Jr.*, No. M2013-00253-CCA-R3-CD, 2014 WL 345345, at *7 (Tenn. Crim. App. Jan. 30, 2014) (finding that the trial court erred in admitting prior bad act evidence to establish intent when the evidence was "minimally probative" and "cumulative"); *State v. Ward*, 138 S.W.3d 245, 272 (Tenn. Crim. App. 2003) (agreeing with the trial court that the admission of two prior unexplained deaths of children in the defendant's care was unfairly prejudicial where the defendant was indicted with the first degree premeditated murder of another child in the defendant's care). Thus, the trial court abused its discretion by admitting the prior bad act evidence to show intent.

### D. Rule 404(b) Exception: Common Scheme or Plan

Although not discussed by either party on appeal, the trial court instructed the jury that it could consider the prior bad act evidence "if it tends to establish that [D]efendant engaged in a common scheme or plan for the commission of two or more crimes so related to each other that proof of one tends to establish the other." Thus, we will consider whether the admission of the prior bad act evidence for the purpose of a common scheme or plan was proper.

"In Tennessee, there are three categories of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999). We have already discussed how the prior bad act and the current offense are not so distinctive as to constitute a "signature crime." Moreover, there is no evidence in the record that the two offenses, which occurred four years apart and against two different victims, were a part of a "larger, continuing plan or conspiracy" or that they were a part of "the same criminal transaction." Thus, the trial court abused its discretion in admitting the prior bad act evidence for this purpose.

### E. Rule 404(b): Harmless Error

Because the trial court abused its discretion in admitting the prior bad act evidence, we must determine whether that error was harmless. The harmless error doctrine

recognizes that the central purpose of a criminal trial is to decide factual questions of a defendant's guilt or innocence, and it promotes the public's respect for the criminal process by focusing on the underlying fairness of the trial rather than technicalities or "the virtually inevitable presence of immaterial error." *State v. Rodriguez*, 254 S.W.3d 361, 366 (Tenn. 2008). Improperly admitted evidence is reviewed under a non-constitutional harmless error analysis. *State v. Jeff Carter*, No. 2009-02399-CCA-R3-CD, 2010 WL 5343212, at *13 (Tenn. Crim. App. Dec. 16, 2010) (citing *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003)). Under this analysis, a defendant must demonstrate "that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Rodriguez*, 254 S.W.3d at 371-72 (quoting Tenn. R. App. P. 36(b)). When assessing the impact of a non-constitutional error, appellate courts must review the record as a whole, considering properly admitted evidence of the defendant's guilt. *Id.* at 372 (citing *Gilliland*, 22 S.W.3d at 274). "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." *Id.* (citing *Toliver*, 117 S.W.3d at 231; *State v. Francis*, 669 S.W.2d 85, 91 (Tenn. 1984)). Whether an error was harmless "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct." *Id.* Instead, appellate courts must determine what impact the error may have had on the jury's decision-making. *Id.*

Here, the evidence of Defendant's guilt was not overwhelming. The State proffered two expert witnesses: Dr. Zimmerman in forensic pathology and Dr. Crook in pediatrics. Dr. Zimmerman performed the victim's autopsy and said that his analysis of the victim's blood clotting gave a "rough estimate" that the victim's injuries occurred between eight and seventy-two hours prior to the victim's death. Dr. Crook examined the victim's autopsy report and initially testified that the victim's injuries occurred "minutes" before the victim's death. In another portion of testimony, Dr. Crook stated that it was just as likely that the injuries occurred one hour prior to death as eight hours prior to death. If Dr. Zimmerman's "rough estimate" is accurate, then the victim suffered the injuries during his stay at Centennial or just prior to his admission to Centennial. If Dr. Crook's estimate is accurate, then the victim may have suffered the injuries while he was alone with Defendant. Further, the State significantly relied on the prior bad act evidence at trial by admitting medical testimony and Defendant's written statement to police regarding A.H.'s injuries, as well as drilling down on the comparisons between the two events in both closing and rebuttal arguments. Because the expert testimony at trial was conflicting as to the estimated time of death, because the material issue at trial was whether Defendant was alone with the victim when the injuries occurred and was thus the perpetrator, and because the State significantly relied on the prior bad act evidence, we conclude that the admission of the prior bad act evidence more probably than not affected the judgment at trial. Thus, we reverse the judgments of the trial court on this ground.

## Conclusion

For the foregoing reasons, we reverse the judgments of the trial court and remand for a new trial consistent with this opinion.

_____

ROBERT L. HOLLOWAY, JR., JUDGE